Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Wednesday, February 04, 2009 1:17:09 PM

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE:                           )
                                 )
210 WEST LIBERTY HOLDINGS, LLC,  )    Case No. 08-677
                                 )
         Debtor.                 )    Chapter 11

## MEMORANDUM OPINION

210 West Liberty Holdings, LLC (the "Debtor") holds real property on which a restaurant facility sits. Liberty Street Enterprises, LLC ("Liberty Enterprises"), leases the property from the Debtor. Some of the principals of the Debtor – or the LLC controlling the Debtor – are the same principals controlling Liberty Enterprises.

This case is before the court on a motion to lift the automatic stay to allow Glen Poe, a disgruntled lender and/or investor in the Debtor, and Daniel Campbell and Jonathan Fertal, the individuals managing the restaurant business for Liberty Enterprises (collectively the "Movants"), to join the Debtor as an indispensable party to post-petition state court litigation that they filed against the principals of the Debtor and their related business entities.

For the reasons stated herein, the court will grant the Movants' motion and modify the automatic stay to allow the Debtor to be named as a party to the pending state court litigation.

## I. BACKGROUND[1]

On April 27, 2007, the Debtor had four members holding equal beneficial interests: James

---

[1] The underlying facts of this case are disputed by the parties. The background information listed herein is garnered from two state court complaints, two bankruptcy adversary proceedings, and the Debtor's bankruptcy filing. In this memorandum opinion, the court is not engaged in findings of fact; rather, the court is only ascertaining the allegations of the parties to determine if "cause" exists under 11 U.S.C. § 362(d)(1) to lift the automatic stay.

Campbell, Steven Foster, Michael Briel, and Louis Athey.  The Debtor was formed for the purpose of holding real property that was to be a restaurant called CW Tiffins.  To finance the purchase price of the real property, the Debtor obtained a loan from Middleburg Bank in May 2007.  That loan is secured by a first deed of trust on the property.  As of its May 2, 2008 bankruptcy petition, the Debtor stated that it owed Middleburg Bank $420,062.  The Debtor also incurred a second debt secured by a second deed of trust on its real property, which had an outstanding balance of about $328,367 as of its petition date.

James Campbell – a founding member of the Debtor – reached an agreement with his brother, Daniel Campbell, to manage the operations CW Tiffins.  Allegedly, James Campbell, and another member of the Debtor, Steven Foster, promised Daniel Campbell that they would design and renovate the restaurant, and then turn the completed project over to him to operate.  Daniel Campbell was to receive pay of $1,500 every two weeks, along with health insurance benefits.  Another individual, Jonathan Fertal, was to help manage the restaurant operations, and he was to be paid $2,000 every two weeks.

In April and May 2007, Daniel Campbell and Jonathan Fertal met with James Campbell and Steven Foster at James Campbell's law office, Campbell, Miller & Zimmerman, PC ("CMZ"), to discuss the business venture.  James Campbell purportedly advised them to organize themselves as a limited liability company to run and manage the restaurant.  Daniel Campbell and Jonathan Fertal then formed JonDaniels, LLC, for that purpose.  Daniel Campbell and Jonathan Fertal soon discovered, however, that the restaurant was not in a finished condition, and, although they received some "paychecks" from Steven Foster before C.W. Tiffins opened for business, those checks were sporadic.

In an effort to finish the tasks necessary to open the restaurant, Daniel Campbell and Jonathan Fertal advanced some expenses.  In June 2007, Daniel Campbell and Jonathan Fertal met with James Campbell and Steven Foster to discuss payment of those out-of-pocket expenses and other restaurant related issues. At that time, they learned that Liberty Enterprises was the business entity registered to do business as CW Tiffins, and it – not JonDaniels, LLC – would be the management entity.  The members of Liberty Enterprises consisted of James Campbell, Andrew Richardson, and Todd Smoot.  On James Campbell's advice, Daniel Campbell and Jonathan Fertal signed an operating agreement with Liberty Enterprises to provide contractual, restaurant

-2-

management services to it.

Meanwhile, the Debtor was actively seeking investors for its restaurant project. One targeted investor was Glen Poe, a client of CMZ. According to Glen Poe, he was led to believe by James Campbell that the CW Tiffins project was fully capitalized, and based on this representation, he agreed to loan the project $100,000, based on certain conditions. Soon after the loan was made, however, Glen Poe began having difficulties with James Campbell and Steven Foster regarding fulfillment of his loan conditions. According to him, he was not given access to the books and records of the Debtor. He also discovered that the proceeds of his loan were not being used to finish restaurant renovations and fund start-up costs, but were being diverted to pay for services provided by Foster-Herz, Inc., a firm operated by Steven Foster. Concerned about his investment, Glen Poe stated that he began working 16-18 hours a day at CW Tiffins, for which he was not compensated, so that the restaurant could open.

Also, in 2007 the membership in the Debtor dramatically changed. Whether this change in membership is effective is the subject to a pending motion by Glen Poe to dismiss the Debtor's Chapter 11 bankruptcy filing. No longer were there four equal members; the Debtor was reorganized into Class A and Class B ownership interests. Class A membership was held by Woodstar Holdings, LLC ("Woodstar"), which consisted of four members: James Campbell, Steven Foster, Thomas Bills, and Andrew Richardson. Woodstar held a 25% ownership interest in the Debtor. As the only Class A member, Woodstar had the right to appoint individual managers, to manage the company's business affairs, and to file bankruptcy. Class B membership was held by a number of individual investors, the largest of whom had a 7.5% ownership share. Of the original members, only Louis Athey and Micheal Briel retained an individual membership interest. Their membership interest, however, was reduced from 25% each, to 3.75% each. In other words, 92.5% of the ownership interests in the Debtor had changed hands since the time it obtained financing from Middleburg Bank.

In October 2007, shortly before CW Tiffins was ready to open for business, Daniel Campbell and Jonathan Fertal met with James Campbell and Andrew Richardson about the Debtor's lease arrangement with Liberty Enterprises. Although Daniel Campbell and Jonathan Fertal believed that lease payments would be between $5,000 and $7,500 per month based on earlier discussions they had with James Campbell, they were informed at the October 2007 meeting that Liberty Enterprises

would owe the Debtor a $179,260 a year for its lease. When the restaurant opened on October 28, 2007, the monthly rental was slightly reduced to $14,500 monthly. According to Daniel Campbell and Jonathan Fertal, the lease payment was broken down into components: $7,500 payable to mortgages owed by the Debtor, $1,500 payable to the Debtor's investors, and $5,500 payable directly to James Campbell and Steven Foster. From October 28, 2007 through April 13, 2008, Liberty Enterprises paid a total of $7,600 in rent to the Debtor.

After the opening of CW Tiffins, and considering the problems he was having with James Campbell and Steven Foster with the $100,000 loan he made to the Debtor, Glen Poe became increasingly concerned about his position in the enterprise. On February 20, 2008, Glen Poe purchased, for value, the second deed of trust on the Debtor's real property. According to Glen Poe, Liberty Enterprises then ceased paying any rent to the Debtor. In turn, the Debtor refused to pay him on the note secured by the second deed of trust. On March 10, 2008, Glen Poe issued a notice that he was accelerating the note based on unspecified prior defaults. On April 13, 2008, Daniel Campbell and Jonathan Fertal were terminated as managers of Liberty Enterprises. C.W. Tiffins was closed for business.

After the Debtor filed its May 2, 2008 Chapter 11 bankruptcy petition, four lawsuits were filed, two of which are adversary proceedings filed by the Debtor in the context of its bankruptcy case. In the bankruptcy court, the Debtor is suing Glen Poe for the purpose of reinstating the note secured by the second deed of trust, and to cure any existing default. In a separate lawsuit, the Debtor is suing Daniel Campbell, Jonathan Fertal, and Glen Poe for trespass, conversion, tortious interference with a business relationship, both statutory and common law conspiracy to injure another in business, and reimbursement for monies loaned. According to the adversary complaint, Daniel Campbell and Jonathan Fertal refused to account for their activities on behalf of Liberty Enterprises, and entered into a business agreement with Glen Poe to operate a restaurant owned by him called the Pine Grove Diner. Among other allegations, the Debtor states that Daniel Campbell and Jonathan Fertal executed secret promissory notes between Liberty Enterprises and themselves totaling $152,247, concealed profits from Liberty Enterprises's video lottery business, and falsely created operating expense reports. Also, the Debtor contends that they broke into CW Tiffins to remove, destroy, convert, and/or vandalize the Debtor's property. The Debtor also alleges that an agreement exists between Daniel Campbell, Jonathan Fertal, and Glen Poe to prohibit Liberty

Enterprises from paying the Debtor rent so that Glen Poe could foreclose on his deed of trust and wrest control of the restaurant property from the Debtor. Finally, the Debtor alleges that it loaned money to Daniel Campbell and Jonathan Fertal; the very same money that they thought were their wages.

Meanwhile, and shortly after the Debtor had filed its bankruptcy petition, Daniel Campbell and Jonathan Fertal filed a state court lawsuit against James Campbell, CZM, Andrew Richardson, Steven Foster, Foster-Herz, Inc., and Woodstar. The complaint seeks damages for unpaid wages, negligent legal counsel and breach of fiduciary duties, and fraud and misrepresentation. Similarly, Glen Poe filed a post-petition state court complaint against the same defendants asserting that they were liable to him for statutory and common law fraud and misrepresentation, negligent legal counsel and breach of fiduciary duties, wage payment, and breach of the $100,000 promissory note payable to him. Because of the Debtor's bankruptcy filing, it was not named as a party defendant.

Pursuant to a 2008 order of the state court, however, the Debtor is an indispensable party to the state court litigation. Consequently, the state court stayed further litigation on the lawsuits until such time as the Debtor could be included as a party without violating the automatic stay of the Bankruptcy Code.

## II. DISCUSSION

In their motion to lift the automatic stay the Movants assert that their claims against the non-debtor parties in the state court litigation cannot be heard without the Debtor being named as a party to the litigation. In the Movants' view, judicial economy will be served if the automatic stay were lifted to allow the state court to hear all claims, especially considering their view that some of their state court claims against non-debtor third parties could not be brought within the context of the Debtor's bankruptcy case.

The Debtor opposes stay relief and requests that all claims be brought against it in the bankruptcy court. It argues that allowing the stay to be modified will impede its ability to formulate a Chapter 11 plan due to the anticipated delay of state court litigation. The Debtor is also concerned about the potential for inconsistent decision between the state court and the bankruptcy court.[2]

---

[2] The Debtor also contends that any claim the Movants have against it must be brought in the context of its filed adversary proceedings inasmuch as those claims would be compulsory

–5–

Relief from the automatic stay of 11 U.S.C. § 362(a) may be granted for cause. § 362(d)(1). "Cause" is not specifically defined in the Bankruptcy Code, but "a desire to permit an action to proceed to completion in another tribunal may provide . . . cause." HR Rep. No. 595, 95th Cong., 1st Sess. 343-33 (1977). In exercising its discretion in determining if "cause" is present to lift the stay, "[t]he court must balance potential prejudice to the bankruptcy debtor's estate against the hardships that will be incurred by the person seeking relief from the automatic stay if relief is denied." *In re Robbins*, 964 F.2d 342, 345 (4th Cir. 1992). The factors the court is to consider include:

> (1) whether the issues in the pending litigation involve only state law, so the expertise of the bankruptcy court is unnecessary; (2) whether modifying the stay will promote judicial economy . . . ; and (3) whether the estate can be protected properly by a requirement that creditors seek enforcement of any judgment through the bankruptcy court.

*Id.*

Here, the court believes that, based on the totality of the circumstances, the above factors weigh in favor of granting the Movants relief from the automatic stay to pursue their claims against the Debtor, and the non-debtor parties, in state court. First, the causes of action alleged by the Movants solely involve issues of state law based on events that took place before the filing of the Debtor's bankruptcy petition. Consequently, the bankruptcy court's expertise is unnecessary for the resolution of those claims.

Regarding the second factor, the Debtor filed its Chapter 11 bankruptcy case on May 2, 2008, and filed its two adversary proceedings on May 16, 2008, and on June 27, 2008. Both adversary proceedings are in the discovery stage. Discovery in the Debtor's two adversary proceedings against the Movants is also relevant to the facts and issues present in the two state court complaints. The Movants served their state court complaints on May 19, 2008, and May 26, 2008. Further activity in the state court actions were stayed by the state court judge on September 28,

---

counterclaims. Under Fed. R. Bankr. P. 7013, however, a party sued by a "debtor in possession need not state as a counterclaim any claim that the party has against the debtor, the debtor's property, or the estate, unless the claim arose after the entry of the order for relief." Here, all the Movants' claims arose before the Debtor filed bankruptcy petition; thus, there is no requirement that the Movants file counterclaims against the Debtor based on its filed adversary proceedings.

-6-

2008. Accordingly, it is neither more nor less judicially economical for the adversary proceedings to continue in bankruptcy court as compared to the two filed state court complaints because neither the adversary proceedings nor the state court actions are advanced, a considerable amount of factual overlap exists between the adversary proceedings and the state court complaints, and any discovery taken within the context of the bankruptcy adversary proceedings is directly relevant to issues pending in the state court complaints.

Third, the Debtor's bankruptcy estate can be protected by modifying the automatic stay to allow the state court to enter judgment against the Debtor, if appropriate. Enforcement of any potential judgment as to the Debtor is a matter of bankruptcy law to be taken up within the context of claims against the Debtor's bankruptcy estate.

Of course, modifying the automatic stay to allow the Movants' litigation to proceed against the Debtor in state court will necessarily mean that the Debtor will have to assert its counterclaims against the Movants. The Debtor's counterclaims against the Movants will, most likely, include at least those claims set forth in its bankruptcy adversary proceeding, No. 08-57, for trespass, conversion, tortious interference with a business relationship, statutory and common law conspiracy to injure another in business, and reimbursement for monies loaned. Consequently, this court will stay further proceedings in adversary proceeding 08-57, and direct that any claims the Debtor has against the Movants be asserted within the context of the pending state court litigation.

With regard to Adversary Proceeding No. 08-43, however, the Debtor is seeking to cure and reinstate its second deed of trust which is held by Glen Poe. Because the Debtor's only apparent business activity is holding real property and leasing it out as a restaurant facility, the Debtor's ability to retain that property is essential to any future reorganization. From the court's review of the complaint filed by Glen Poe in state court, no cause action has been asserted by him on the second deed of trust. The court does not believe that allowing Adversary Proceeding No. 08-57 to move forward in the bankruptcy court will unduly interfere or overlap with the pending proceedings in state court, or with the anticipated assertion of the Debtor's counterclaims against the Movants in state court.

### III. CONCLUSION

The court will grant the Movant's relief from the automatic stay to allow the Debtor to be named as a party defendant in the Movant's state court litigation. The Debtor shall file its

counterclaims against the Movants in the context of the state court litigation. Because those counterclaims include, at a minimum, the allegations made by the Debtor against the Movants in adversary proceeding number 08-57, the court will stay further litigation in that adversary proceeding until such time as the Debtor voluntarily dismisses the case, the state court enters judgment on the Debtor's counterclaims, or until such other time as the court deems appropriate. The court will retain, and will allow further litigation to occur in adversary proceeding No. 08-43, but only to the extent the adversary proceeding seeks to reinstate, cure, maintain and/or modify payments on the second deed of trust held by Glen Poe.

       The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021.