# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

IN RE:                          )
                                )
210 WEST LIBERTY HOLDINGS, LLC, )    Case No. 08-677
                                )
            Debtor.             )    Chapter 11

## MEMORANDUM OPINION

Glen R. Poe requests that the Chapter 11 case of 210 West Liberty Holdings, LLC ("the Debtor") be dismissed on the grounds that: (1) the filing of the bankruptcy is not authorized under the Debtor's operating agreement; and (2) even if the filing of the case is authorized, it should be dismissed or converted for cause under 11 U.S.C. § 1112(b).[1]

For the reasons stated herein, the court concludes that the filing of the bankruptcy case is authorized, but will convert this case to one under Chapter 7 pursuant to § 1112(b).[2]

## I. BACKGROUND

In 2006, James P. Campbell was looking for possible restaurant business opportunities in the Eastern Panhandle of West Virginia. At the time, James's brother, Daniel Campbell, had restaurant

---

[1] Also before the court are Mr. Poe's argument that: (1) this case should be dismissed because it was filed in bad faith; and (2) failing dismissal or conversion, Mr. Poe seeks relief from the automatic stay to foreclose on his deed of trust; (3) to prohibit the use of his cash collateral; and/or (4) the appointment of a Chapter 11 trustee. Given the court's decision in this case, these arguments are either moot, or will be continued to allow the Chapter 7 trustee time to review the motions.

[2] This court's opinion is rendered in accordance with the dictates of § 1112(b)(3). The motion to dismiss was taken under advisement after closing arguments were heard on May 13, 2009. To the extent that the court has exceeded the time within which its decision must be rendered (i.e., one day), the court notes that the press of its schedule prevented it from providing its opinion any earlier.

management experience and was living in South Carolina. James saw the potential of a restaurant venture in the Eastern Panhandle of West Virginia as a way to bring his brother closer to home.

In early 2007, James located historic property in Charles Town, West Virginia, known as the Charles Washington Inn. The property is located at 210 West Liberty Street. According to James, it was built by George Washington's younger brother, Charles, and is the oldest surviving structure in Charles Town. Moreover, the property had been used as a restaurant since 1990. Although the existing restaurant did no advertising, James told potential investors that it had consistent annual revenue of about $300,000 per year.[3] With substantial advertising, and the addition of gambling and catering revenue, James projected that the business could increase revenue to $650,000 in the first twelve months of operation.

To purchase the property, James formed the Debtor and solicited three of his friends and/or business partners, Steven Foster, Michael Briel, and Louis Athey, to be members. According to the Debtor's operating agreement dated April 26, 2007, each of the four members held a 25% interest. Regarding the management of the Debtor, the April 26, 2007 Operating Agreement states:

> 3.1 **Management and Voting Rights.** Unless otherwise agreed, the members will have equal rights in the management of the LLC business. Except as provided otherwise in this agreement, all decisions will be by majority vote with each member who is admitted as a member having a vote in proportion to his or her membership interest . . . . The members may elect one or more persons to serve as managers to serve pursuant to the West Virginia Code. The manager, or managers if more than one is serving, will have the right, power and authority to manage the business affairs of the company and will serve until replaced by the members. For so long as a manager is serving in that capacity, no other member will have any authority to manage the business affairs of the company. Until otherwise agreed by the members, the initial managers of this company shall be James P. Campbell, Steven D. Foster, Michael E. Briel and Louis B.Aethy.
>
> 3.2 **Certain Issues Requiring Unanimous Vote.** The following action require a unanimous vote:
>     A.    Borrowing on behalf of the LLC or pledging its assets in any way;
>     B.    Lending LLC money or other assets;
>     C.    Transferring, assigning, encumbering or selling any portion of a member's interest in the L.L.C., either directly or indirectly;

---

[3] In his direct testimony, James stated that the previous operators actually made between $200,000 and $275,000 per year.

> D. Distributions of capital;
> E. Distributions of income;
> F. Admission of a new member;
> G. Change of accounting method;
> H. Amendment to operating agreement of varying from its terms.
>
> . . . .
>
> 7.2 **Amendment and Revocation.** This agreement may be amended, altered or revoked at any time, in whole or in part, by written instrument signed by all the parties. No change, modification or revocation of this agreement will be valid unless it is in writing and signed by all the parties or their duly authorized representatives.
> . . .

(Creditor's Exhibit 4).

The original four members of the Debtor understood–and agreed–that the membership and management of the Debtor would be altered such that a business entity would hold a 25% ownership interest in the Debtor as the managing "Class A" member, and that the remaining 75% ownership interest would be held by as many as 20, non-managerial, "Class B" members. Class B membership interests were to be sold to investors. In exchange for a $10,000 capital contribution, an investor would receive a 3.75% ownership interest in the Debtor. Importantly, the Debtor was only to own the real and personal property, which it would then lease to another entity for the purpose of running the restaurant business. Investors were to be paid out of the monthly rental payments.

James Campbell created Liberty Street Enterprises, LLC, ("LSE") to serve as the Debtor's lessee. In turn, LSE executed a restaurant management agreement with Daniel Campbell and Jonathan Fertal to actually run the day-to-day operations of the restaurant.

Before implementing this business plan, however, the original four members of the Debtor had to purchase the real property, and the personal property associated with the existing restaurant business. The agreed purchase price was $725,000. To finance the purchase, the Debtor borrowed $400,000 from Middleburg Bank, secured by a first deed of trust on the real property, and owner-financed the remaining $325,000 with CT Liberty Limited Liability Company, who had a second deed of trust on the real property.[4] Each of the Debtor's four original members are personally liable on both notes.

The members of the Debtor all agreed that before the restaurant could open for business,

---

[4] Mr. Poe eventually purchased the second deed of trust from CT Liberty Company.

−3−

substantial renovations needed to be completed. To obtain the capital needed to complete these renovations, the Debtor began soliciting Class B investors even though the April 26, 2007 Operating Agreement had no provision for the allowance of Class B members. Among the various investors solicited was Glen Poe, who also owned and/or operated other restaurants in the area. In addition to restaurant experience, Mr. Poe has significant construction experience, and, having taken an interest in the project, Mr. Poe began to personally assist in the renovations of the restaurant facility. To secure his promised Class B membership interest, Mr. Poe sent Michael Briel a $10,000 check. That money sat in Mr. Briel's trust account for several weeks before being forwarded to the Debtor's bank account on August 27, 2007.

By August 2007, the Debtor had not received enough cash from its purported Class B members to complete the renovation of its restaurant property. At a meeting between James Campbell, Glen Poe, Louis Athey, and Michael Briel, Mr. Poe made a proposal that he would lend the Debtor $100,000 to complete the restaurant renovations under certain conditions. Among those conditions were that James Campbell, Louis Athey, and Michael Briel would guarantee the $100,000 note, and that Steven Foster would terminate his membership. Mr. Poe would then assume the membership interest of Mr. Foster. Also, Mr. Briel would be given control over the Debtor's checking account, which had previously been under the control of Mr. Foster. James Campbell told Mr. Poe that if he would make the loan, Mr. Poe would not only be a "Class A" member of the Debtor, but he would be at the "head of the Class." The parties at the meeting agreed to Mr. Poe's conditions, and a contemporaneous telephone call to Mr. Foster confirmed his approval of the proposal. Mr. Poe's $100,000 loan was wired into the Debtor's bank account on August 30, 2007.

Shortly after agreeing to abandon his membership interest in the Debtor, Mr. Foster met with Mr. Poe to explain that he was reluctant to forego his membership interest in the Debtor given that he was personally obligated on the first deed of trust owed to Middleburg Bank, the second deed of trust owed to CT Liberty Limited Liability Company, and, in addition, the renovations of the restaurant were being done under his contractor's license. Over drinks, Mr. Poe and Mr. Foster settled their differences, and Mr. Poe agreed to waive the requirement that Mr. Foster dissociate as

-4-

a member of the Debtor.[5]  Meanwhile, Mr. Athey refused to sign the personal guarantee on Mr. Poe's $100,000 note, and he resigned as a putative "Class A" member of the Debtor but wished to retain an interest as a putative "Class B" member.  Following Mr. Athey, Mr. Briel also resigned as a managing member of the Debtor and he expressed his desire to only be a putative "Class B" investor.[6]

After making the loan to the Debtor, the relationship between Mr. Poe, James Campbell, and Steven Foster began to deteriorate.  Although Mr. Poe loaned the Debtor $100,000, the conditions he placed on the loan were not being met.  For example, Mr. Athey refused to guarantee the note, and Mr. Foster – not Mr. Briel – retained control over the Debtor's checking account.

Despite their dispute over whether the conditions of Mr. Poe's $100,000 loan were being met, the restaurant opened for business on October 27, 2007.  James Campbell testified that it collected about $60,000 a month in gross revenue.  Due to difficulties in establishing and maintaining an accurate restaurant accounting system, however, the net profit and/or loss from the restaurant is unknown.  Regardless of the restaurant's financial status, it was not paying LSE enough money to allow it to make its monthly rental obligations to the Debtor.  In total, LSE only made one, partial, $6,000 rental payment before the Debtor filed its bankruptcy petition.  The precise reasons why LSE was unable to make its rental payments to the Debtor is the subject of collateral litigation between the parties pending in State court.

On April 13, 2008, James Campbell, among others, exercised self-help remedies and took possession of the restaurant premises.  As a result, the restaurant closed for a period of time.  On April 28, 2008, James Campbell drafted a new operating agreement for the Debtor, which created Class A and Class B membership interests.  Class A membership is held by Woodstar Holdings, LLC. Mr. Poe is not listed as either a Class A or a Class B member, and is not listed as a member of Woodstar.  The April 28, 2008 Operating Agreement gives Woodstar the sole authority to file a

---

[5] Both James Campbell and Steven Foster testified that this agreement was reached before Mr. Poe made the $100,000 loan.  Mr. Poe stated that he could not remember the timing sequence.

[6] The exact date of Mr. Briel's resignation is disputed between Mr. Briel and James Campbell.  Both parties agree, however, that the resignation took place before the Debtor's May 2, 2008 bankruptcy petition.

bankruptcy petition on behalf of the Debtor. Pursuant to that power, Woodstar filed the Debtor's Chapter 11 bankruptcy petition on May 2, 2008.

## II. DISCUSSION

Mr. Poe contends that he is a member of the Debtor, he did not authorize the April 28, 2008 Operating Agreement, and he did not consent to the filing of the bankruptcy petition. Also, Mr. Poe asserts, even if the bankruptcy filing is authorized, it should be dismissed or converted for cause under 11 U.S.C. § 1112(b).

**A.    Authority to File**

Mr. Poe argues that the filing of the Debtor's bankruptcy petition is an unauthorized act because the Debtor's April 28, 2008 Operating Agreement is invalid, and he–as a managing member of the Debtor–did not consent to the bankruptcy filing. Therefore, Mr. Poe contends the court must dismiss this case. *E.g.*, *Price v. Gurney*, 324 U.S. 100, 106 (1945) ("If the . . . Court finds that those who purport to act on behalf of a corporation have not been granted authority by local law to institute the [bankruptcy] proceedings, it has no alternative but to dismiss the petition."); *Hager v. Gibson*, 108 F.3d 35, 39 (4th Cir. 1997) (same).

Even assuming, without deciding, that Mr. Poe is a managing member of the Debtor, and that the April 28, 2008 Operating Agreement is invalid, the filing of this bankruptcy case is still authorized under the April 26, 2007 Operating Agreement.

The determination of who has the authority to file a bankruptcy petition on behalf of a business entity is based on state law because "[t]he Bankruptcy Code does not establish what the internal requisites are for the initiation of a voluntary corporate bankruptcy proceeding." *In re American Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996).

Under West Virginia law, an LLC is a legal entity that has attributes of both a corporation and a partnership. To the extent that the LLC's operating agreement does not provide otherwise, Chapter 31B of the West Virginia Code "governs relations among the members, managers and company." W. Va. Code § 31B-1-103(a). Chapter 31B does not specifically address the filing of a bankruptcy petition on behalf of an LLC, and the filing of a bankruptcy petition is not listed among the non-waiveable provisions of the Uniform Act. §§ 31B-1-103(b) (stating that an operating agreement may not waive statutory requirements regarding, among other things, the duty of loyalty or the right to expel a member); 31B-2-203(c)(1) ("Articles of organization of a limited liability

company may not vary the nonwaivable provisions of section 1-103(b). As to all other matters . . . . [t]he operating agreement controls as to managers, members and members' transferees . . . .").

Under the Debtor's April 26, 2007 Operating Agreement, "all decisions will be by majority vote with each member who is admitted as a member having a vote in proportion to his or her membership interest." Thus, the court must determine who is a member of the Debtor, who has management authority, and whether a majority of the membership interest of those entitled to vote authorized the filing of the bankruptcy petition.

When the Debtor's Operating Agreement of April 26, 2007, was executed, the Debtor only had four members: James Campbell, Steven Foster, Michael Briel, and Louis Athey; each having a 25% membership interest. All four original members are also named as managers, and James Campbell is named as the tie-breaking vote for any deadlock in management decisions.

Before the Debtor filed its May 2, 2008 bankruptcy petition, both Mr. Athey and Mr. Briel resigned as managing members, and, consequently, were dissociated from the Debtor.[7] § 31B-6-602. As such, neither Mr. Aethy nor Mr. Briel could participate in the management of the Debtor. § 31B-6-603(b)(1). Thus, under Mr. Poe's theory, the only managing members of the Debtor were James Campbell, Steven Foster, and Glen Poe. Mr. Poe's negative vote for the authorization of bankruptcy filing would not be sufficient to defeat the majority vote necessary for the filing of the bankruptcy petition. Consequently, because: (1) both James Campbell and Steven Foster authorized the filing, (2) James Campbell and Steven Foster had a minimum of a 50% membership interest in the Debtor, and (3) the April 26, 2007 Operating Agreement designated Mr. Campbell as the tie-breaker vote, the terms of the April 26, 2007 Operating Agreement were satisfied for authorizing the filing of the bankruptcy petition.[8]

---

[7] Both Mr. Athey and Mr. Briel agreed to become "Class B" members; however, under the terms of the April 26, 2007 Operating Agreement, there was no such thing as a "Class B" member. Even if there were, the parties stated that this putative membership class had no management rights.

[8] The Debtor's bankruptcy petition was actually filed by Woodstar Holdings, LLC, an entity chosen by James Campbell and Steven Foster to be a manager of the Debtor and to hold the Class A membership under the purported April 28, 2008 Operating Agreement. Even assuming that the April 28, 2008 Operating Agreement is invalid, both James Campbell and

–7–

**B.     Dismissal Under 11 U.S.C. § 1112(b)**

Mr. Poe asserts several items that, in his view, require this court to dismiss the Debtor's bankruptcy petition for cause under 11 U.S.C. § 1112(b).

Section 1112(b) of the Bankruptcy Code allows a court, in the exercise of its discretion, to convert or dismiss a Chapter 11 case for cause, whichever is in the best interest of creditors and the estate. "Cause" is not specifically defined in the Bankruptcy Code, but § 1112(b) lists several, non-exclusive examples of what may constitute cause. Among the enumerated causes for either converting or dismissing a case are gross mismanagement of the estate and failure to timely satisfy reporting requirements. §§ 1112(b)(4)(B),(F).

   **1.     Findings of "Cause" to Convert or Dismiss Under § 1112(b)**

      **a.     § 1112(b)(4)(B)**

Section 1112(b)(4)(B) provides that "cause" is present to convert or dismiss a case where there has been "gross mismanagement" of the estate. This subsection focuses on the conduct of the estate's affairs (not the debtor's) and requires that the mismanagement be "gross" in character, meaning that the mismanagement is "glaringly noticeable usu[ally] because of inexcusable badness or objectionableness." *Webster's Ninth New Collegiate Dictionary* 538 (1991).

Mr. Poe has demonstrated three examples of mismanagement of the estate by the Debtor, which, individually or in combination, constitute gross mismanagement of the estate within the meaning of 11 U.S.C. § 1112(b)(4)(B).

First, the Debtor's schedule of personal property lists an $81,830 rent obligation owing to it by the operator of the restaurant, LSE. No effort has been undertaken to collect that receivable from LSE, and no investigation has been done to ascertain if the principals of that entity can be held personally liable on the obligation. One of the Debtor's principals, Steven Foster, testified that he would not sue LSE or its principals because the principals of that entity were friends of his. This receivable was not included as an asset of the Debtor in its disclosure statement and is not subject to liquidation under the Debtor's proposed plan. The Debtor's refusal to pursue collection of an

---

Steven Foster have indicated their assent to the filing of the bankruptcy petition. The court does not find any defect in the filing of the bankruptcy petition sufficient to warrant the dismissal of this case.

-8-

asset of the estate (or to provide a compelling reason why such an asset is not being pursued) constitutes gross mismanagement of the estate.

Second, because the Debtor has not received any income of a substantial nature during the course of this bankruptcy case, third parties have been advancing money to pay for the Debtor's expenses. No court approval was sought to authorize the receipt of the benefit of these post-petition transactions. Although the Debtor's operating reports from August 2008 through April 2009 indicate that the Debtor was borrowing money on a monthly basis, the August 2008 through January 2009 operating reports were not filed until February 5, 2009. In a supplemental report dated February 9, 2009, the Debtor states that the sums "borrowed" are "contributions from equity interest" and are mostly "contributed" by James Campbell. At this time, it is unclear whether the sums advanced are gifts, capital contributions to the Debtor, loans made with the expectation of repayment, or payments by guarantors/sureties that give rise to claims of indemnity and/or contribution against the Debtor. The point here is only that these sums of money are being transferred by third parties to the Debtor without full, timely disclosure to the court and parties in interest, or, if required, approval by the court for engaging in some form of post-petition financing.

Third, the Debtor's restaurant premises is in violation of the local fire code. Some of the fire code violations have existed for over a year, and the restaurant is in danger of losing its occupancy permit. As James Campbell stated, the value of the Debtor is in having its property being used as a restaurant operation. If the property loses its occupancy permit and the restaurant is forced to close its doors, then substantial value to the estate may be lost.

In this court's view, the above three examples of mismanagement are objectionable, individually or in combination, and are sufficiently gross to constitute cause to convert or dismiss this case under 11 U.S.C. § 1112(b)(4)(B).

   **b.**  **§ 1112(b)(4)(F)**

Under § 1112(b)(4)(F), the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter," constitutes cause to dismiss or convert a Chapter 11 case. This ground is established in this case.

An operating report is due not later than the 15th day of the month following the month covered by the operating report. Here, the Debtor has been late in filing its operating reports. For example:

–9–

| Operating Report Period | Operating Report Filed |
| --- | --- |
| December 2008 | February 5, 2009 |
| November 2008 | February 5, 2009 |
| October 2008 | February 5, 2009 |
| September 2008 | February 5, 2009 |
| August 2008 | February 5, 2009 |

In fact, the Debtor filed its delinquent operating reports only after Mr. Poe's motion to dismiss was filed on January 16, 2009, and only six days before the original hearing on the motion, which was held on February 11, 2009. Moreover, given the circumstances of the Debtor's past performance, it is doubtful that the operating report for January 2009 would have been filed on time but for Mr. Poe's motion to dismiss.

Operating reports and the financial disclosures accompanying them are the life-blood of the Chapter 11 process. They are the means by which creditors can monitor a debtor's post-petition operations, and, as such, are an important obligation of a debtor in possession. The failure to timely file operating reports in itself constitutes cause to dismiss or convert a case, and habitual non-compliance calls into question a debtor's ability to effectively reorganize. *E.g.*, *Ronald Kern & Sons v. United States Tr.*, No. 01-CV-0717E, 2002 U.S. Dist. LEXIS 13884 at *5 (W.D.N.Y. June 11, 2002) ("Debtor's deficient and untimely financial statements provided sufficient cause to dismiss Debtor's Chapter 11 proceeding.").

### 2. Unusual Circumstances and Reasonable Justification: §§ 1112(b)(1) and (2)

Having determined that cause exists to dismiss or convert this case pursuant to § 1112(b)(4)(B) and (F), § 1112(b)(1) directs that "the court shall" dismiss or covert this case unless there are "unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interest of the estate." Given the basis on which the court has found cause to convert or dismiss this case, the court knows of no such "unusual circumstances" that would warrant a deviation from the mandate of § 1112(b)(1) to either dismiss or convert the Debtor's case.

Nevertheless, under § 1112(b)(2), in the absence of such "unusual circumstances," the court may still exercise its discretion not to convert or dismiss this case for cause based on the Debtor's objection to dismissal, so long as the Debtor can establish, among other things, that "the grounds

for granting such relief include an act or admission of the debtor . . . (i) for which there exists a reasonable justification . . . and (ii) that will be cured within a reasonable period of time . . . ." § 1112(b)(2)(B).

To reiterate, the following are the bases for the court's finding of cause to either convert or dismiss this bankruptcy case, and to forestall either conversion or dismissal, the Debtor must demonstrate both that its actions were reasonably justified and that the cause to dismiss or convert the case can be cured within a reasonable period of time:

1.    The failure of the Debtor to pursue an $81,830 rent obligation owing to it by Liberty Street Enterprises, LLC. The Debtor has also failed to include this receivable as an asset in its disclosure statement, or its liquidation in the proposed plan.

2.    The receipt of monies and/or benefits from third parties during the course of this bankruptcy case that were received outside the Debtor's ordinary course of business and which may give rise to post-petition liabilities against the estate.

3.    The Debtor's real property is in violation of the existing fire code and is in danger of losing its occupancy permit. Some of the fire code violations are over a year old and still have not been remedied by the Debtor.

4.    The Debtor has failed to timely file operating reports.

The Debtor has failed to demonstrate a "reasonable justification" to excuse these "cause" findings.[9]

First, Steven Foster testified that the Debtor's failure to pursue the $81,830 rent obligation owing to it by LSE was because the principals of LSE were friends of his. In fact, James Campbell was the architect for the creation of LSE, which he created solely for the purpose of operating the restaurant and paying rent to the Debtor. The Debtor made no showing to the court that an action against LSE for unpaid rent would be fruitless and has otherwise failed to articulate any "reasonable justification" as to why its failure to pursue this asset of the estate is justified.

Second, while in bankruptcy, the Debtor has not received steady rental income. Monthly

---

[9] Because the Debtor has failed to demonstrate a reasonable justification to excuse the cause findings identified by the court, the court need not address whether the cause findings may be cured within a reasonable period of time under § 1112(b)(2)(B)(ii).

operating reports from August 2008 through April 2009 reflect that the Debtor was borrowing money.  In providing supplemental information, the Debtor attempted to clarify that the additional income was from "contributions from equity interest," and primarily came from James Campbell. No cogent explanation exists as to the exact nature of these "contributions," but the court strongly doubts that such sums (totaling $25,118.43 through April 2009) were gifts to the Debtor.  Although James Campbell attempted to explain that such sums were paid by persons who had guaranteed certain of the Debtor's obligations, that was not always the case.  For example, J. Michael Cassell assisted in "contributing" $3,000 in November 2008, and he was not listed as a guarantor on any note signed by the Debtor.  Likewise, entities known as Market Street Holdings, LLC and 201 North George Street, LLC made a payment to Middleburg bank on behalf of the Debtor when they were not obligated on the Debtor's note.  Moreover, the Debtor's ledger listed the amounts "contributed" by James Campbell in August and September 2008 as loans, and the first pages of the Debtor's monthly operating reports indicate that it was "borrowing" money.  On the whole, it appears to the court, at this time, that James Campbell and others, have been financing the Debtor's post-petition operations without seeking court approval,  in violation of 11 U.S.C. § 364(b).  No reasonable justification has been advanced to explain this failure.

Third, the Debtor's failure to remedy fire code violations jeopardizes the Debtor's entire plan of reorganization.  Without an occupancy permit, the Debtor cannot continue to lease its real property as a restaurant business.  As James Campbell testified, the value of the Debtor's real and personal property is increased if it can be leased or sold as a going concern.  Also, as the property's current "tenant," Azmi Zarou, stated, if the restaurant shut down even for a short time, he would be reluctant to continue to operate a restaurant in that location.  If the building loses its occupancy permit, no restaurant business may operate, and whatever additional value may be garnered from the sale or lease of the Debtor's real property as a going concern will be lost.   The Debtor has known about these fire code violations for about a year, and has not advanced any justifiable reason for failing to remedy the violations.

Fourth, the Debtor's failure to timely file operating reports is evident on the record.  To receive the benefits of being a debtor-in-possession in a Chapter 11 case, a debtor must comply with reporting requirements to allow the court, parties in interest, and the United States trustee transparent access to the debtor's financial affairs.  The filing of operating reports months behind schedule,

-12-

especially for a business that has very little monthly business activity and which is effectively controlled by a member who is himself a bankruptcy attorney, is simply inexcusable.

### 3. Conversion or Dismissal

Because the court has found cause to dismiss or convert the Debtor's case under 11 U.S.C. § 1112(b) of the Bankruptcy Code, and has found that no reasonable justification exists for the cause findings identified by the court, the court is required to either dismiss or convert this case under § 1112(b)(1).

As between conversion and dismissal, the court believes that the estate may benefit from administration by a Chapter 7 trustee, who can make a thorough determination as to whether there is any value to be extracted from the estate after considering the claims of the secured creditors. There are back rent accruals that may have value and potential claims against insiders to consider. In addition, a Chapter 7 trustee may be able to effect a sale of the restaurant premises to Azmi Zarou, who expressed an interest to the court in assuming the Debtor's secured liabilities and in making a lump sum payment to the estate of $150,000. Thus, the court will convert this case to one under Chapter 7 of the Bankruptcy Code.

## III. CONCLUSION

The court will enter a separate order pursuant to Fed. R. Bankr. P. 9021 that converts this case to one under Chapter 7.